UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEBORAH L. FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-0325-DFH-TAB |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Deborah L. Foster seeks judicial review of a final decision by the
Commissioner of Social Security denying her application for supplemental security
income benefits.   Acting for the Commissioner, an Administrative Law Judge
("ALJ") determined that Ms. Foster was not disabled under the Social Security Act
because she retained the residual functional capacity to perform the full range of
light work.   For the reasons explained below, the ALJ's decision is supported by
substantial evidence and is therefore affirmed.

*Factual Background*

Ms. Foster was 45 years old in 2004 when the ALJ found her ineligible for
supplemental security income under the Social Security Act.   Ms. Foster had an
eleventh grade education.   R. 96.   She had prior work experience as a maid,

cashier, and solderer.  R. 91.  Her reported earnings were so modest, however, that the ALJ determined that this work did not qualify as substantial gainful activity so that she had no prior relevant work under the Act.  See 20 C.F.R. § 416.965.

Ms. Foster applied for supplemental security income in August 2003.  She claimed to suffer from asthma, high blood pressure, and pain in her back, legs, and arms.  R. 90.  She claimed that these impairments disabled her, within the meaning of the Social Security Act, after April 1, 1993.  R. 67.  Ms. Foster previously had applied for supplemental security income in August 2001.  That application was denied in February 2002 and not appealed.  R. 37-38.

On April 14, 2000, Ms. Foster visited the Wishard Hospital emergency room, complaining of chronic congestion and cough.  See R. 249.  The treating physician noted that she had a history of asthma, hypertension, and fibromyalgia.  Ms. Foster requested a refill of her inhaler and Vicodin for pain.  The doctor concluded that Ms. Foster might have chronic bronchitis and was in need of the inhaler.  However, he refused to give her a prescription for narcotics "in spite of her demand and resultant anger."  He noted that her previous clinic physician similarly had refused a few months prior and that Ms. Foster had "fired" him and made an appointment to see a new physician, Dr. Overhage.  He advised upon release that Ms. Foster could return to regular work.  R. 252.

On June 23, 2000, Ms. Foster visited Dr. Overhage at Wishard Hospital complaining of intermittent pain in her knees, lower back, hips, and wrists, as well as insomnia.  See R. 240-43.  Ms. Foster reported that a rheumatologist had once told her that she might have fibromyalgia because joint injections did not help the pain in her knees.  On examination, Ms. Foster did not have tenderness in her neck, spine, or at any trigger points.  Dr. Overhage noted that Ms. Foster's knees were large but he found no effusion.  He gave her some medication for insomnia and suggestions for better sleep.

On July 5, 2000, Ms. Foster visited the Wishard Hospital emergency room complaining of shortness of breath and a persistent cough.  R. 236.  Chest x-rays showed "markedly low lung volumes" but all other findings were unremarkable.  R. 208.

Ms. Foster visited Dr. Overhage on July 21, 2000, who made notes about her hypertension, anxiety, asthma, and myofascial pain dysfunction syndrome.  See R. 231.  Dr. Overhage noted that her blood pressure was still quite high even on medication.  He noted that she seemed to be doing fairly well with her anxiety, although he suspected that she was taking more than her prescribed dose of anti-anxiety medication.  Dr. Overhage also noted that Ms. Foster's asthma was "much improved" on a steroid inhaler, but she reported no improvement in her pain.

On August 11, 2000, Ms. Foster attended a follow-up visit with Dr. Overhage. See R. 211. She reported that her pain was "feeling better" the "last several days," and that she was "doing okay" with respect to anxiety, although her medication made her "a little sleepy." Dr. Overhage noted that Ms. Foster's hypertension was improved but still not optimal. He also noted that Ms. Foster was in no apparent distress, was well groomed, and had intact memory and normal insight and judgment.

Ms. Foster saw Dr. Overhage on September 15, 2000 and "continue[d] to complain about dropping things and tingling." See R. 228. Dr. Overage noted that she was "mostly worried that she cannot get food stamps or medicaid" and that she was "going out of town this weekend and want[ed] early refill[s] on narcotics." He noted that Ms. Foster still had not scheduled testing for hypertension. He also noted that she was "not really getting anywhere" with her myofascial pain dysfunction syndrome, but that he would refer her to physical therapy.

In a visit to Dr. Overhage on July 24, 2001, Ms. Foster brought disability forms for him to complete. See R. 214-15. She complained that her elbow joints locked up and that her hands were going numb. She reported problems cleaning, bathing, and doing her hair. Dr. Overhage concluded that her symptoms were "probably" due to myofascial pain dysfunction syndrome. He noted that she had been referred to a pain clinic but had failed to go two weeks in a row. Ms. Foster

also complained of hip pain, but Dr. Overhage found that she had full range of motion in her hips.  He doubted that there would be any pathology there.  An x-ray of her left hip in September was normal and confirmed this conclusion.  R. 216.  Dr. Overhage also noted that Ms. Foster's hypertension was elevated but that she would not undergo testing for it.  He reported the same again in September 2001.  R. 219.

On December 10, 2001, Ms. Foster was seen by Ray Henderson, M.D., for a consultative physical evaluation.  See R. 202-06.  Ms. Foster reported pain in her back and right shoulder and diffuse pain "all over" for the previous four years.  Dr. Henderson noted that Ms. Foster was obese but that she had normal gait and station.  He noted that her lungs were clear.  He recorded limited ranges of spinal motion and apparent difficulties in tandem walking and balancing, but he attributed both findings to "poor compliance."  He recorded normal muscle strength and fine finger manipulative ability.  Dr. Henderson noted that Ms. Foster appeared to be "quite depressed and simultaneously agitated," but was alert and in no acute distress.  Dr. Henderson wrote that she had a history of fibromyalgia, chronic pain syndrome aggravated by psychological factors, hypertension, obesity, a history of asthma, and chronic depression.  He advised that Ms. Foster be considered able to perform all of the usual activities of daily living.

On February 12, 2002, Ms. Foster underwent a consultative psychological evaluation with Cynthia Dixon, Ph.D.  See R. 169-72.  Ms. Foster reported to Dr.

Dixon that she could independently perform daily living activities but occasionally required assistance due to physical impairments. Ms. Foster said that she had depression and anxiety, and she reported experiencing daily crying spells. She reportedly received outpatient counseling in 1997 for two to three months but no other psychiatric treatment or therapy. She received anti-anxiety medication (Xanax) from Wishard Hospital. Dr. Dixon diagnosed Ms. Foster with dysthymic disorder and assigned a Global Assessment of Functioning ("GAF") rating of 55.[1]

On February 19, 2002, a state agency physician reviewed the record and completed a physical residual functional capacity ("RFC") evaluation of Ms. Foster. See R. 176-83. He concluded that she could perform work that required lifting up to 20 pounds occasionally and 10 pounds frequently, standing and/or walking about 6 hours in a workday, sitting about 6 hours in a workday, and operating hand or foot controls. R. 177. Another state agency physician reviewed the record in October 2002 and agreed with this evaluation. See R. 183.

On February 21, 2002, a state agency psychologist reviewed the record and concluded that Ms. Foster did not have a severe mental impairment. See R. 184-97. He concluded that she had mild limitations in daily activities, social functioning, and concentration, persistence, or pace, and had no episodes of

---

[1]A GAF of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000) (DSM-IV-TR).

decompensation.  R. 194.  Another state agency psychologist reached this same conclusion after reviewing the record in October 2002, and in March 2003 a third reviewing psychologist concurred.  R. 152, 154.

On September 25, 2002, Ms. Foster saw I. Mandelbaum, M.D., for a consultative physical examination.  See R. 161-62.  She complained of "hurting everywhere" and suffering from asthma and chronic bronchitis for the past five years.  Dr. Mandelbaum observed that Ms. Foster was a tall obese woman in no distress.  He recorded that she had a strong gait, clear lungs, full range of motion and muscle strength throughout, a strong grip, and that her fine motor movements were intact.  He noted no tenderness in her back or any part of the body.  Dr. Mandelbaum concluded that the examination was "non-productive," and he made no diagnosis.

On October 15, 2002, Ms. Foster saw Nancy Ingwell, Ph.D., for a consultative psychological evaluation.  See R. 156-60.  Ms. Foster claimed nearly all symptoms asked about by Dr. Ingwell, including:  pain, anxiety and/or asthma attacks, crying spells, concentration and memory problems, and hallucinations.  Ms. Foster reported that she was taking pain medication (Vicodin), anti-anxiety medication (Xanax), blood pressure medication, and was using inhalers.  She reported that she shopped with her daughter sometimes, attended church, tried to read novels, and watched two or three hours of television each day.  She was

upset because she did not have her own place to live, but lived with her daughter who had an eight-month-old baby.

Dr. Ingwell stated that Ms. Foster's cooperation with the examination was "okay," although she left the room to use the restroom when she became "lightheaded," would not perform the serial 7's test because she felt she was hyperventilating, and told Dr. Ingwell: "I can't really sit to answer your questions. It bothers me.  I don't have any type of patience."  Dr. Ingwell noted that Ms. Foster's mood was anxious, but that her speech and mental trend were within normal limits.  She diagnosed Ms. Foster with "[a]nxiety disorder with features of panic and/or asthma" and assigned a GAF rating of 55.

In November 2002, Ms. Foster was seen at Wishard for sinusitis.  R. 134, 140-41.  Ms. Foster requested medicine for her cough and Vicodin for her pain. The treating physician gave her cough medication but told her that she was not due for a refill of pain medication.

On January 3, 2003, Ms. Foster called Dr. Overhage's office with concerns about forms.  R. 139.  Dr. Overhage completed an RFC evaluation of Ms. Foster on January 7, 2003.  See R. 164-66.  He opined that she was incapable of sitting more than two hours per day, standing or walking more than one hour per day, lifting or carrying any weight, performing repetitive pushing and pulling of arm controls, and performing frequent fine manipulation.  Dr. Overhage check-marked

that his opinion was based on clinical observations, and he listed her diagnoses as myofascial pain dysfunction syndrome, hypertension, plantar fasciitis, and foot pain.

Ms. Foster saw Dr. Overhage again in August 2003.  See R. 264.  Ms. Foster claimed that she was having more pain in her right knee, and the doctor observed some swelling.  She also reported back muscle spasms and pain in multiple areas. On examination, she was obese, well groomed, and in no apparent distress.  Dr. Overhage noted that her hypertension was "uncontrolled, mainly due to non-compliance at this point."

Ms. Foster and a vocational expert testified before ALJ Paul Armstrong on January 26, 2004.  Ms. Foster was represented by counsel.  Ms. Foster testified that her "whole body hurts . . . all day every day."  R. 284.  She also claimed that some days she was unable to get out of bed because of her joints locking up.  R. 291.  Ms. Foster testified that she took three different types of blood pressure medications but that her blood pressure was not under control.  R. 283.  She claimed that she used her inhaler every day, R. 292, and had about four severe asthma episodes a week.  R. 294.

When asked to explain her psychological problems, Ms. Foster testified that she loses her breath when she becomes upset, usually when she considers that she does not have her own place or any income.  R. 288.  She testified that she

had panic attacks about twice per week.  R. 296.  Ms. Foster testified that she had

no problems getting along with people at her prior job, R. 289, but that her pain

made her not want to be around others.  R. 290.

The ALJ issued his decision denying supplemental security income on

March 25, 2004.  See R. 11-19.  The Appeals Council denied further review of the

ALJ's decision, R. 5, so the ALJ's decision is treated as the final decision of the

Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v.

Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Ms. Foster filed a timely petition for

judicial review.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

*The Statutory Framework for Determining Disability*

To be eligible for supplemental security income, a claimant must establish

that she suffers from a disability within the meaning of the Social Security Act.

To prove disability under the Act, the claimant must show that she was unable to

engage in any substantial gainful activity by reason of a medically determinable

physical or mental impairment that could be expected to result in death or that

has lasted or could be expected to last for a continuous period of not less than

12 months.   42 U.S.C. § 1382c(a)(3)(A).   Ms. Foster was disabled only if her

impairments were of such severity that she was unable to perform work that she

had previously done and if, based on her age, education, and work experience, she

also could not engage in any other kind of substantial work existing in the

-10-

national economy, regardless of whether such work was actually available to her. 42 U.S.C. § 1382c(a)(3)(B).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)    Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)    If not, could the claimant perform other work given her residual functional capacity, age, education, and experience? If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Applying the five-step process, the ALJ found that Ms. Foster satisfied step one because she had not engaged in substantial gainful activity since her alleged onset date of disability.  At step two, the ALJ found that Ms. Foster had severe impairments of hypertension and asthma.  At step three, the ALJ found that Ms. Foster failed to demonstrate that any of her severe impairments met or equaled a listed impairment.  At step four, the ALJ found that Ms. Foster had no past relevant work.  At step five, the ALJ found that Ms. Foster retained the residual functional capacity to perform the full range of light work.  Based on these findings, the ALJ concluded that Ms. Foster was not disabled within the meaning of the Social Security Act.

## Standard of Review

"The standard of review in disability cases limits . . . the district court to determining whether the final decision of the [Commissioner] is both supported by substantial evidence and based on the proper legal criteria."  *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S.

389, 401 (1971).  To determine whether substantial evidence exists, the court must "'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision . . . ."  *Briscoe*, 425 F.3d at 351, quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  The court must not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based a decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  This determination by the court requires that the ALJ's decision adequately discuss the relevant issues:   "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."   *Briscoe*, 425 F.3d at 351, citing *Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994). Although the ALJ need not provide a complete written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005),

a remand may be required if the ALJ has failed to "build a logical bridge from the evidence to his conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

*Discussion*

Ms. Foster argues that the ALJ erred by (1) improperly ignoring her treating physician's opinion; (2) overlooking evidence about several of her impairments; and (3) failing to obtain an updated expert opinion in light of additional evidence that was received at the hearing level. For the reasons explained below, Ms. Foster's arguments are not persuasive. The ALJ's decision is affirmed.

I.   *Treating Physician's Opinion*

Ms. Foster first argues that the ALJ erred by ignoring her treating physician's opinion about her residual functional capacity. Dr. Overage completed a residual functional capacity evaluation for Ms. Foster on January 7, 2003. See R. 164-66. He opined that she was incapable of sitting more than two hours per day, standing or walking more than one hour per day, lifting or carrying any weight, performing repetitive pushing and pulling of arm controls, and performing frequent fine manipulation. If credited, these restrictions would render her disabled. However, because the ALJ considered this evidence and reasonably found it was not credible, Ms. Foster's argument does not succeed.

First, the ALJ did not err by failing to mention Dr. Overhage by name or discuss his evaluation separately.  An ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence in the record. *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ must, however, articulate some legitimate reason for the decision.  *Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003).  Most important, the ALJ must build an accurate and logical bridge from the evidence to the conclusion.  *Id.* at 539.

The ALJ noted that Ms. Foster considered Wishard Hospital and the physicians there to be her primary care givers.  However, he concluded that the records of those physicians "provided neither an adequate discussion nor clinical data" to support her allegations about her impairments.  See R. 16 (citing Exhibit 1-F).  The ALJ's general discussion of Dr. Overhage's records demonstrates that he considered his findings, including his residual functional capacity evaluation.

Second, the ALJ's decision to discount Dr. Overhage's evaluation is supported by substantial evidence.  Although a treating physician's opinion is important, the court must keep in mind that a treating physician may be affected by the desire to help a patient, or the physician may not have a sense of how the claimant's case compares to other cases.  *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).  An ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician or if the treating source's

opinion is internally inconsistent, as long as the ALJ provides a reasoned explanation for the decision. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). Moreover, an ALJ need not defer to a treating physician's determination of a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e)(2).

Dr. Overhage's assessment was inconsistent with the findings of other physicians. As the ALJ noted, several agency physicians had concluded that Ms. Foster could perform light work activity with only occasional postural limitations. The ALJ also noted that Dr. Mandelbaum found no evidence of asthma or range of motion deficits. Dr. Mandelbaum observed that Ms. Foster was neurologically intact and he found no source for the alleged pain in her back, legs, and arms.

In addition, Dr. Overhage's assessment was not well supported by his own medical findings. Dr. Overhage consistently noted that Ms. Foster appeared to be in no distress. He made few clinical findings to support any physical limitations. Although he noted that Ms. Foster's hypertension was not under control, he attributed this problem to non-compliance on her part. The ALJ acted within his discretion in not giving Dr. Overhage's opinion controlling weight. See 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).

II.   *Evidence of Several Impairments*

Ms. Foster also argues that the ALJ failed to consider several of her impairments in determining her ability to work.  Ms. Foster contends that the ALJ ignored evidence in the record related to obesity, fibromyalgia, hypertension, insomnia, depression, anxiety, myofascial pain syndrome, osteoarthritis, joint pain, and asthma.

An ALJ may not select and discuss only the evidence that favors her ultimate conclusion.  The ALJ must minimally articulate reasons for rejecting or accepting specific evidence of disability so that a reviewing court can trace the path of the ALJ's reasoning.  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  Moreover, an ALJ may not ignore an entire line of evidence that is contrary to the ruling.  See *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (remanding because ALJ improperly ignored three lines of evidence).  In assessing a claimant's residual functional capacity, an ALJ is required to consider the combined effect of all of the claimant's impairments, including non-severe impairments.  See 20 C.F.R. § 404.1523; *Golembiewski*, 322 F.3d at 918; SSR 96-8p (recognizing that non-severe impairments, when considered together with limitations and restrictions due to other impairments, may be critical to the outcome of a claim).[2]

_____

[2]Ms. Foster also argues that the ALJ should have found several of her non-severe impairments to be severe impairments.  See SSR 96-3p (noting that an impairment that is not severe must be a slight abnormality that has no more than a minimal effect on the ability to do basic work activities).  It is true that the claimant's burden at step two is not an onerous one.  However, at later steps, the ALJ evaluates a claimant's ability to work based on the totality of her
(continued...)

The ALJ's decision in this case adhered to these principles. In concluding that Ms. Foster retained the ability to perform light work, the ALJ relied on the opinions of several state agency physicians who had reviewed the entire record. The ALJ was required to consider the assessments of these physicians. See 20 C.F.R. § 416.927(f)(2)(i); SSR 96-6p. The ALJ also adequately articulated his reasons for rejecting or accepting specific evidence in the record. The court addresses Ms. Foster's specific criticisms as they relate to each of her alleged impairments.

A.    *Obesity*

The record shows that Ms. Foster weighed about 235 pounds and was 68 inches tall. R. 231. This corresponds to a body mass index of 35.8, which is considered obese. See SSR 02-1p. Ms. Foster claims that the ALJ erred by not listing her obesity as an impairment and by not even mentioning her stature in his decision.

SSR 02-1p provides that a claimant's obesity should be considered at all steps of the disability evaluation process. The Ruling states that the ALJ should consider especially the combined effects of obesity with other impairments, and

---

[2](...continued)
impairments. Therefore, as long as the ALJ proceeds beyond step two (as the ALJ did in this case), no error could result from this asserted mistake.

it points out that obesity can cause exertional limitations, postural limitations, and intolerance for extreme temperatures or humidity.

Ms. Foster did not claim obesity as an impairment either in her application or at her hearing. However, there are a few references in the record to her weight problem. Both Dr. Henderson and Dr. Mandelbaum noted that Ms. Foster was obese but found no physical limitations. Dr. Overhage noted Ms. Foster's obesity in his examination reports but also did not discuss any limitations attributable to the condition. Despite the limited attention given to Ms. Foster's obesity, these references in the record were sufficient to alert the ALJ to her condition. Cf. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (references to weight problem in record, despite claimant's failure to claim obesity as impairment in application or at hearing, were likely sufficient to put ALJ on notice of issue).

The court need not remand for the ALJ to explicitly consider Ms. Foster's obesity since doing so would not affect the outcome of this case. In *Skarbek*, the court affirmed the ALJ's residual functional capacity finding despite the ALJ's failure to consider the claimant's obesity. 390 F.3d at 505. The claimant had not specified how his obesity further impaired his ability to work, but merely had speculated that his weight made it more difficult for him to stand and walk. The Seventh Circuit found no reason to remand the case where the ALJ adopted the recommendations of doctors and specialists who were aware of the claimant's obesity when they made their findings. *Id.* at 504.

This case is similar to *Skarbek*.  Ms. Foster has failed to explain how her obesity caused limitations not accounted for by the ALJ's residual functional capacity determination.  The state agency physicians were aware of her obesity when they made their findings.  They did not conclude that her condition imposed any additional limitations.  Because the ALJ adopted these findings, as in *Skarbek*, his decision accounted for Ms. Foster's obesity.

The cases cited by Ms. Foster in support of remand are distinguishable.  In *Clifford v. Apfel*, the Seventh Circuit remanded because, along with other errors, the ALJ had failed to consider the disabling effect of the claimant's weight problem.  227 F.3d 863, 873 (7th Cir. 2000).  First, there is no indication that the ALJ in *Clifford* relied on expert medical opinions that had considered the claimant's weight.  In fact, the court recommended that the ALJ obtain such opinions if necessary on remand.  Second, there was specific evidence in the record that some of the claimant's symptoms were aggravated by her high fat diet.  Ms. Foster has not identified similar evidence in this record.  Third, the *Clifford* court identified two specific impairments of the claimant – severe arthritis of the knees and high blood pressure – that were significantly related to obesity under Listing 9.09.  Listing 9.09 has since been deleted because the Social Security Administration concluded that its criteria were not appropriate indicators of listing-level severity.  See SSR 02-1p (revising disability standards applicable to obesity).  Regardless, the ALJ's finding in this case adequately accounted for the ways in which Ms. Foster's weight might affect her other impairments.  Ms. Foster

did not establish any significant limitation due to arthritis and the ALJ fully considered her hypertension.

The other cases cited by Ms. Foster are inapposite because the evidence shows that her obesity did not qualify as a listing-level impairment.  Cf. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (remanding where ALJ did not discuss or even reference the "critical" listing related to mental retardation in child claimant); *Roberts v. Barnhart*, 283 F. Supp. 2d 1058, 1067 (S.D. Iowa 2003) (ALJ's decision that claimant's morbid obesity did not meet or equal listed impairment was not supported by substantial evidence where claimant was 60.5 inches tall and weighed about 313 pounds with a body mass index of about 50, was diagnosed by every examining physician with obesity, and where examining physicians concluded that claimant's obesity affected all daily activities and worsened her back pain).  In sum, the ALJ's decision should not be reversed simply because it failed to mention Ms. Foster's obesity.

B.    *Pain and Related Conditions*

Ms. Foster also argues that the ALJ failed to account for her osteoarthritis, joint pain, fibromyalgia, and myofascial pain syndrome.  The ALJ deemed Ms. Foster's alleged fibromyalgia, pain, and "nerve problems" to be non-severe impairments because he found in the record "no significant clinical observations or diagnostic test results that document[ed] the presence of these impairments as limiting her ability to work."   R. 15.   In determining Ms. Foster's residual

functional capacity, the ALJ again commented on the lack of clinical proof that Ms. Foster's alleged pain in her back, arms, and legs interfered with her ability to work, and he noted that the evidence instead showed she was capable of most exertional activities.  R. 16, 17.  The ALJ's findings are supported by substantial evidence.

First, there is no evidence in the record that Ms. Foster was ever diagnosed with fibromyalgia.  Dr. Overhage's examinations revealed no tenderness or trigger points as required for a fibromyalgia diagnosis.  He consistently declined to diagnose fibromyalgia and instead listed Ms. Foster's condition as myofascial pain dysfunction syndrome.  The notations of fibromyalgia in the records of other physicians appear to be derived from Ms. Foster's own reports about her alleged condition.

Regardless of her diagnosis, the evidence shows that Ms. Foster's pain did not limit her ability to work.  For example, the ALJ noted that Ms. Foster did not exhibit any discomfort or pain at any time during the hearing.  He concluded that this reflected poorly on her alleged level of discomfort and pain.  R. 17.  The ALJ also considered Ms. Foster's daily activities.  *Id.*  In addition, Dr. Mandelbaum's and Dr. Henderson's examinations support the ALJ's conclusion that Ms. Foster's pain did not prevent her from performing light work.

Ms. Foster attempts to discredit the ALJ's reasoning by pointing to the following language from *Sarchet v. Chater* : fibromyalgia's "cause or causes are unknown, there is no cure, and . . . its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." 78 F.3d 305, 306 (7th Cir. 1997). She argues that this language indicates that the ALJ erred by looking for "clinical observations or diagnostic test results" to document her condition. But *Sarchet* also recognized that most persons with fibromyalgia are not totally disabled from working. 78 F.3d at 307. *Sarchet* did not dispense with the requirement that a claimant's fibromyalgia must actually limit the ability to work to be considered disabling. See, *e.g.,* 20 C.F.R. § 404.1529(a) (Commissioner will determine the extent to which claimant's alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs, laboratory findings, and other evidence to decide how claimant's symptoms affect the ability to work); see also *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998) ("The bottom line . . . is that whatever the diagnosis – tarsal tunnel of the ankles and feet, or fibromyalgia throughout the body – [the claimant] must provide sufficient evidence of actual disability . . . ."). Although fibromyalgia's symptoms may be subjective, its painful limiting effects can be objectively documented. The ALJ noted that none of Ms. Foster's examining or treating physicians documented any such limitations, and he found that Ms. Foster's daily activities were inconsistent with such limitations.

Ms. Foster also cites to Dr. Overhage's records as evidence that she suffers from joint pain and osteoarthritis.  See R. 231.  Dr. Overhage's records do not show that he made these diagnoses but rather that Ms. Foster reported them as problems during her visit.  In addition, the medical evidence in the record undermines her claim of disability based on these impairments.  Dr. Overhage found full range of motion in Ms. Foster's hips, and an x-ray in September 2001 confirmed that at least her left hip was normal.  Although Dr. Henderson recorded limited ranges of spinal motion, he attributed this finding to poor compliance.  Dr. Mandelbaum found full range of motion throughout.  Based on the lack of supporting evidence in the record, the ALJ properly concluded that Ms. Foster was not limited in her ability to work because of her pain or related conditions.

C.    *Insomnia*

Third, the ALJ did not err in concluding that Ms. Foster was not limited because of insomnia.  Ms. Foster never claimed insomnia as an impairment in either her benefits application or at her hearing before the ALJ.  Dr. Overhage treated Ms. Foster for complaints of insomnia when he saw her initially in June 2000, but he did not consistently report this as an ongoing problem.

Most important, Ms. Foster has not explained how insomnia limits her ability to work.  There is certainly no evidence in the record of any limitations caused by insomnia.  Ms. Foster points out that typical symptoms of insomnia include sleepiness during the day, general tiredness, irritability, and problems

with concentration or memory. "Arguably," she concludes, "each of these symptoms would pose problems in any work environment, and would make it difficult . . . to get and keep any job." Pl. Reply Br. at 4. This hypothetical statement about the general consequences of insomnia cannot substitute for evidence of such consequences in Ms. Foster herself. See *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (claimant's statement that irritable bowel syndrome was known to cause fatigue was insufficient to undermine ALJ's conclusion that claimant did not suffer from fatigue where there was no evidence of the symptom in the record). Because Ms. Foster has not offered evidence to support a finding that she was limited by insomnia, the ALJ did not err by omitting discussion of this condition from his decision.

D.    *Hypertension*

Ms. Foster also contends that the ALJ improperly ignored evidence related to her hypertension. She points to her blood pressure measurements from 2000 through 2002 as evidence that her hypertension was not well-controlled.

The ALJ did find Ms. Foster's hypertension to be a severe impairment but he concluded that it did not prevent her from doing light work. In reaching this conclusion, the ALJ relied on agency physician opinions that expressly considered her high blood pressure readings. Once again, the ALJ did not err simply because he did not discuss the specific evidence cited by Ms. Foster. *Schmidt*, 395 F.3d

at 744 (ALJ need not provide a complete written evaluation of every piece of testimony and evidence).

The record indicates that Ms. Foster repeatedly refused to follow Dr. Overhage's advice regarding testing and treatment for her hypertension. To recover benefits, a claimant must follow treatment prescribed by her physician if it would restore her ability to work. If the claimant does not follow prescribed treatment without good cause, she will not be found disabled. See 20 C.F.R. § 404.1530(a), (b); *Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000). Dr. Overhage concluded in August 2003 that Ms. Foster's hypertension was uncontrolled mainly because of her non-compliance. This circumstance also supports the ALJ's conclusion that Ms. Foster's hypertension did not render her disabled. Cf. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (remanding where ALJ concluded that claimant's seizures were uncontrolled because he failed to follow prescribed treatment of anti-convulsant medication, but cited no record evidence demonstrating that non-compliance affected frequency of seizures).

E.    *Asthma*

Ms. Foster argues that the ALJ failed to explain how her asthma would allow her to meet the walking and standing requirements for light work. See 20 C.F.R. § 404.1567 (physical exertional requirements for light work: "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg

controls"); see also SSR 83-10.  She points to a July 2000 x-ray showing that she had low lung volumes.

The ALJ adequately considered Ms. Foster's asthma but concluded that it did not limit her ability to do light work.  Although the ALJ categorized her asthma as a severe impairment, he found that it did not meet the listings because Ms. Foster did not have frequent attacks requiring physician intervention or in-patient hospitalization.  See R. 16.  The ALJ also noted that Dr. Mandelbaum's recent examination had found no evidence of asthma, and that there was no evidence in the record that her condition interfered with her ability to work.  *Id.*  The ALJ did account for Ms. Foster's asthma when he limited her to light work that would require only minimal exposure to conditions that might exacerbate her condition (*e.g.*, extremes of heat, cold, sunlight, and harsh chemicals).  See R. 19.

Ms. Foster's July 2000 x-ray was taken during an acute episode of shortness of breath and following a three-day cough.  As the Commissioner points out, Dr. Overhage later reported that Ms. Foster's asthma was "much improved" with a steroid inhaler.  See R. 231.  The ALJ did not err by weighing all of the evidence and concluding that Ms. Foster's asthma allowed her to perform light work.  Moreover, the ALJ did not err simply by failing to discuss the July 2000 x-ray specifically.  Again, an ALJ is not required to provide a complete written evaluation of every piece evidence in the record, as long as his decision demonstrates that he has considered all of the relevant evidence.  *Schmidt,*

395 F.3d at 744.  The court is satisfied that the ALJ considered all of the evidence relating to Ms. Foster's asthma.

     F.    *Mental Impairments*

Finally, Ms. Foster argues that the ALJ should have found that her mental condition limited her ability to work.  She points out that she took medication to manage her anxiety, yet physicians still noted that she was anxious and agitated.  She argues that the ALJ never discussed her poor memory and how it was accommodated by her residual functional capacity.  She claims that she is irritable and unable to deal effectively with people.  Generally, Ms. Foster contends that she is unable to meet the basic mental demands of unskilled work as described in SSR 85-15:  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."

The ALJ's finding with respect to Ms. Foster's mental impairments is supported by substantial evidence.  The ALJ explicitly relied on the opinions of three state agency psychologists who had reviewed the record and concluded Ms. Foster did not have a mental impairment that significantly affected her ability to

do unskilled work.  The ALJ also cited several specific findings relevant to her mental condition.  First, he noted that Ms. Foster had never been psychiatrically treated for anxiety and that she had only been prescribed anti-anxiety medication as an adjunct to a medical follow-up of her physical complaints.  R. 16.  The ALJ also discussed Dr. Ingwell's conclusion that Ms. Foster's depression and anxiety appeared to be more the result of unemployment and lack of income rather than any medical condition.  *Id.*  This conclusion was consistent with Ms. Foster's testimony at her hearing.  The ALJ noted that he had attempted several times during the hearing to elicit some indication of a psychiatric impairment, but at no time did Ms. Foster or her attorney offer that a mental impairment limited her ability to work.  *Id.*  Ms. Foster specifically testified that she had no problems getting along with others.

Finally, the ALJ noted that Dr. Ingwell found Ms. Foster capable of performing daily living activities, such as grooming, dressing, bathing, and maintaining social activities.  He noted that she attended church.  He reasoned that Ms. Foster was able to concentrate well enough to read and watch television for a few hours each day.  R. 16.  Based on his consideration of all of this evidence, the ALJ's finding that Ms. Foster was not limited in her ability to work by any mental impairment was supported by substantial evidence.

III.   *Evidence Submitted at Hearing Stage*

Finally, Ms. Foster argues that the ALJ erred by not obtaining an updated medical expert opinion after she submitted additional evidence at the hearing stage.  Ms. Foster submitted Dr. Overhage's January 7, 2003 evaluation after the state agency medical consultants had reviewed her file.  She argues that the ALJ was required to have a medical expert review this additional evidence before making a final determination about her residual functional capacity.  She argues that the ALJ's failure to do so demonstrates that he improperly interpreted "raw medical data" without the assistance of a medical expert.

Because of the non-adversarial nature of Social Security proceedings, the ALJ is responsible for developing a fair and full record.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Williams v. Massanari*, 171 F. Supp. 2d 829, 833 (N.D. Ill. 2001) (remanding case where medical expert at hearing specifically qualified his testimony because of missing medical records and ALJ relied on expert's opinion).  In addition, SSR 96-6p requires an ALJ to consult a medical expert if: (a) "in the opinion of the administrative law judge," the evidence suggests that the claimant's condition may be medically equal to one of the listed impairments; or (b) additional evidence is received that "in the opinion of the administrative law judge" may change the state agency physician's opinion that the impairments are not equivalent to a listed impairment.

-30-

As previously noted, the ALJ did not interpret "raw medical data" without the assistance of a medical expert because he properly relied on the opinions of several state agency physicians and psychologists and consulting experts. The ALJ was not required to submit Dr. Overhage's evaluation to a medical expert for review. The record was otherwise adequately developed. Dr. Overhage's opinion contained no new medical findings or analysis and, as discussed above, it was patently inconsistent with the other evidence in the record.

Ms. Foster's reliance on SSR 96-6p is misplaced. She has not explained how any of her conditions met or equaled a listed impairment, and the ALJ expressly found that the evidence did not support such a finding. Dr. Overhage's evaluation could not have assisted in this matter. Ms. Foster also has not explained how the addition of Dr. Overhage's opinion might have changed the opinion of any state agency physician on this point. The ALJ acted within his discretion in deciding that the existing evidence was sufficient to make a finding about Ms. Foster's disability. Contrary to Ms. Foster's suggestion, this exercise of his discretion did not amount to "playing doctor." Cf. *Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003) (citing cases in which ALJ substituted his own judgment for a physician's opinion without relying on other medical evidence or authority in the record).

*Conclusion*

Ms. Foster has offered little to no evidence demonstrating that her alleged impairments imposed physical or mental limitations inconsistent with performing light work.  The ALJ reasonably concluded that she was not disabled under the Act.  His decision was consistent with the law and supported by substantial evidence.  Accordingly, the Commissioner's decision is affirmed.  Final judgment will be entered accordingly.


So ordered.

Date: March 31, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov